REID, Judge.
Plaintiff Gulf States Utilities Company filed this suit against Mrs. Beatrice B. Wright to obtain a right of way over and across Mrs. Wright’s property consisting of some 22.15 acres of land in Sections 37 and 73, T 6 S R 2 E, in the Parish of East Baton Rouge.
The servitude sought would measure 150 feet in width, that is a right of way 75 feet on each side of a center line, particularly described as follows:
“Beginning at the south line at a point located 140 feet easterly from the southwest corner of said tract, thence north 08 degrees 43 minutes east 1019 feet crossing the north line of said tract of land at a point located 270 feet westerly from an *664 interior northwest córner of same; said interior northwest córner also being the southeast corner of the Marceline F. Miley tract of land.”
There are the usual allegations of necessity and an attempt to amicably secure a right of way.
Defendant filed an answer denying the necessity, and that if said right of way were granted that it would mean that the remainder of her property would be valueless for subdivision development and would cause her irreparable harm and injury and a loss in money in the sum of $250,000.00.
Defendant reconvened, alleging that she had subdivided her parcel of land consisting of 22.15 acres into a subdivision known as “Alford Park” containing 38 separate lots, and that she had been developing and planning to proceed with her subdivision. She then sought judgment in reconvention for certain improvements and subdivision costs and expenses, totalling $26,755.00, plus $100.00 for all trees 6 inches in diameter, $300.00 for all trees 12 inches in diameter, and $500.00 each for trees over 12 inches in diameter, and $500.00 each for trees over 12 inches in diameter which should be cut from her property, and further seeks $125,000.00 severance damages to the main property, and attorneys fees in the amount of $20,000.00 and in the alternative for $250,000.00 for the loss of her subdivision, and $2000.00 for expenses for the appraisers used to value her property.
Plaintiff and defendant in reconvention filed an answer denying the allegations of the reconventional demand.
The Lower Court after the trial and for oral reasons assigned granted the right of way and servitude and awarded the defendant the sum of $16,100.00 with legal interest from date of judicial demand until paid and all costs of suit. The judgment fixed the fee and expenses of the expert appraiser, Kermit Williams at $700.00 and W. D. Mc-Cants, another expert appraiser, in the sum of $600.00, all to be cast as part of the costs against the plaintiff. The Court set the witness fee of Toxie Craft in the amount of $50.00 and taxed it as cost, to also be paid by the plaintiff.
From this judgment the plaintiff has brought this appeal. The appeal was lodged in this Court on February 18, 1966 and the defendant in proper person filed an answer to the appeal on October 24, 1966.
Defendant argued that she was not a lawyer, and had terminated the services of her attorneys who tried the case and she was unfamiliar with the law on filing an answer to an appeal. However, the answer was filed some ten months after the appeal was lodged. Article 2133 LSA-C.C.P. sets-forth the time when an answer to an appeal must be filed, in the following words, to-wit:
“An appellee shall not be obliged to' answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands-damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record, whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him and of which he complains in his answer.”
Our Courts have repeatedly held that where an appellee’s answer to an appeal was filed too late the Court of Appeal was powerless to give it consideration. See Brousseau v. Rheem Manufacturing Co., La.App.1948, 34 So.2d 273; Flower v. Myrick, 49 La.Ann. 321, 21 So. 542; Lambert v. Faucheux Chevrolet Co., La.App. 1964, 161 So.2d 344.
Therefore the only issue left for this Court to pass upon is that of the award for just compensation and severance damages of the Lower Court.
*665 The Gulf States witnesses swore that a ISO foot right of way was necessary and that they planned to construct a 69,000 volt line to Hooper Road in 1965; 138,000 volt line in 1967; 69,000 volt line in 1968 and 138,000 volt line in 1971. This would make ■69,000 and 138,000 volt lines constructed right away with another 207,000 volts by the ■end of 1971 which would make a total when the lines were completed of 414,000 volts. 'The line would be swung from what is ■called an “H” frame, consisting of two poles tied together with cross arms and these two ■cross arms as the second circuit is installed there would be a total of two frames located in this right of way.
Defendant, after purchasing this property, decided to develop it as a subdivision and •secured the services o-f Mr. Toxie Craft an ■engineer of Baton Rouge to draw a plan of ■survey for the subdivision.
Mr. Craft divided it into 38 lots being 100 x 200 feet in depth, a map of which is in the record. There was a road known as Droze Road originally running through this property and now extending north of it. 'This road is unimproved and that portion ■of it which lies across defendant’s property was abandoned and closed by the City-Parish government of East Baton Rouge Parish. This subdivision did not front on a ■main highway but it adjoined Alford Acres ■on the east and there is an entrance street known as Alford Drive coming in to this property from the west between Lots 19 and .20 of the original Craft survey. It comes in to Wrightwood Drive which runs north .and south and the proposed right of way will take up Wrightwood Drive and extend •over some 45 feet on the lots east of said Drive. This will leave 4.3 acres above the proposed right of way and 14.05 acres below the proposed right of way. The right of way itself takes up 3.82 acres.
Mr. Craft after making this plan secured the necessary data and got a preliminary •approval by the planning commission and the commission council of Baton Rouge.
Defendant then secured a contract with one Bernard Kimbro, a contractor, to do the necessary improvement work, such as grading streets and all things necessary to complete the development for the subdivision, so that she could put the lots on the market for sale. She started this in 1957 and up until the suit had been filed very little work had been done on the subdivision other than grading up some streets, drainage and utility lines. In the meantime the sewerage regulations of the Board of Health had been changed and Mrs. Wright was notified that she would have to provide sewerage and sewerage disposal in some form before they would give a final approval to her subdivision. The original plan did not provide for water or sewerage, and the lots in the adjoining Alford Acres likewise did not furnish these utilities. Mr. Kimbro’s contract called for the sum of $25,000.00 and he was to work on his off hours and take part of his pay in lots of the subdivision.
It was about this time that the plaintiff began its proceedings to expropriate the land for the right of way.
The Gulf States Utilities Company, hereinafter called “Gulf States” used two appraisers, John Lejeune and J. B. Pugh. The defendant, likewise, used two appraisers, Kermit A. Williams and W. D. Mc-Cants.
I am now going to briefly outline the testimony of the four appraisers, who testified in this case, the first being Mr. John Lajeune, one of plaintiff’s appraisers. Mr. Lejeune had four years experience as an appraiser and he styled himself a Realtor and Appraiser. He has a broker’s license but he does not sell real estate at the present time. He took a few short courses in appraising and had worked for the Gulf States Utilities at various times. He had developed several subdivisions in the Baton Rouge area. Mr. Lejeune testified that there were three approaches in appraising this property. The cost approach, market data approach, and income approach. He *666 testified that you could use the income approach in what is called a subdivision residual process to determine the value. He used the market data comparison approach. He found three comparables in the immediate vicinity which he used in making the appraisal. The first was a sale from Joseph N. Lopez to Verdie Reese Perkins on September 18, 1959. It contained 47.556 acres and the consideration was $61,822.80 or a price of $1300.00 per acre. This property had 1500 feet frontage on Greenwell Springs Road. He next used a sale from Jessie C. Inman to W. J. Speakman on August 31, 1961. It contained 62.38 acres of which 928 feet fronted along Greenwell Springs Road and the consideration was $47,000 which included a house and barn. He considered the house and barn of no value and figured a sale price of $723.00 per acre. The third sale was from Mrs. Ella M. Graham et al. to the Congregation of St. Alphonsus Roman Catholic Church on August 19, 1963. This tract contained 38.85 acres and sold for $58,500.00 or a price of $1506.00 per acre. Using these compara-bles he then placed a value of $1300.00 per acre on Mrs. Wright’s property.
This being the fee value of the property he then figured the value of the servitude at 80% of the fee value amounting to $1040.00 per acre and the amount of the compensation for the 3.82 acres would be $3975.00.
He testified that the highest and best use of the subject property is for a potential residential subdivision and that a prudent developer would not subdivide it at this time. He made a short study of lots in Alford Acres, the adjoining subdivision, and those prices ran from $1750.00 a lot up to $2450.00 a lot. However, he said there were several transfers and the lots sold for decreasing amounts over the years.
The next appraiser for the plaintiff, Mr. J. B. Pugh, testified that he was in the mortgage, loan and general insurance and appraisal business. He had been in the appraisal business connected with mortgage loans since 1946 or ’47. He is a member of the American Institute of Real Estate Appraisers. He had qualified as an expert appraiser in the 19th Judicial District Court before. He estimated that the value of a typical lot 100 x 200 feet without water would be $1500.00, and with water $2000.00. He used the market data approach the same as Mr. Lejeune and used the same com-parables that Mr. Lejeune did plus a sale from James D. Kelly and John Richard' Kelly to Gulf States Utilities dated April,. 1962 of 6.19 acre tract for $3753.00 or $606.-00 an acre.
He considered the Kelly sale the most comparable and figured the valuation of the proposed right of way at $600.00 per acre for the fee, and that the servitude would be worth 80% of the fee or $480.00 per acre. The value of the 3.80 acres taken would amount to $1824.00. He figured that the severance damage should be 10% of the remaining 18.35 acres at $60.00 an acre would be $1101.00, or a total value of $2925.-00.
He testified that he used another approach, the subdivision residual approach, to. check his figures on the market data approach and in making that approach he figured the cost of the land plus the cost of the improvements and development and' profit at 1/3 for the land, Y¡ for the development, and Yz for profit. He did not use this-approach however.
Mr. Toxie Craft, the engineer employed by the defendant, • to map out and secure the necessary permits from the Commission Council and the Subdivision Committee, and the Board of Health estimated the costs of the approved plan lay-out as-follows: street and drainage would be $26,-670.75, sewerage and treatment plant $13,-304.85, engineering $3997.56 which would include inspection, water lines $3550.00, gas line $3588.00. The total amount of expenses, of the development $51,111.16.
Mr. W. D. McCants, one of the appraisers for the defendant testified that he- *667 used the market data approach and fixed a value of $2450.00 per lot. He testified that light poles detract from property and that wooded lots were more valuable than denuded lots. He further testified that the Alford Park was within walking distance from a recreational park. Using the market data approach he figured the gross income would be $93,100.00 which is 38 lots at $2450.00 a lot. He then estimated the cost of development to be $58,488.00. He then used an expected profit of 25% which would amount to $8653.00. He figured the current commission on a sale of real estate is 6%. Deducting the development cost and the expected profit from the gross leaves a net of $25,959.00. He estimated that the owner had spent $3645.00 already which he would add to the value of the land to the ■developer, and indicated that the value of the subdivision would be $29,604.00. This would be $1337.00 per acre.
He then estimated that he could divide the remaining two tracts of land into 25 lots and figuring the sales price at $2450.00 a lot would give him a total of $61,250.00. He then figured the development costs at '$41,062.00 and the profit to a developer at 25%, $5,057.00. This would leave the value ■of the naked land at $15,141.00. The value then would be $825.00 per acre.
He then estimated the loss per acre $512.00. Applying this to the 18.35 acres remaining would give a value of $9,395.00 •damage to the remaining portion. Appraising the value of 3.82 acres taken at $1337.00 per acre would give an amount of $5,081.00 which added to the $9,395.00 would make a total assessment of $14,476.00 which is what he estimated to be a fair and equitable settlement to the owner of the property. He rounded it off to a market concept of $14,500.00.
On cross examination he broke down his development costs as follows: $25,000.00 the amount of the contract price that Mrs. Wright had with Mr. Kimbro, engineering $3645.00, septic tank and so. forth $13,395.-■00, utilities, gas and water $7138.00, sales $9310.00 would make a total of $58,488.00. There is a difference between Mr. Craft’s estimate of the cost of development of the streets and the contract price of some $1670.75. He used the contract price.
Mr. McCants further testified that he checked his estimate against sales of other acreage in the vicinity but did not use these comparables in fixing the value. The com-parables were a sale by George Washington Ivesworth to Benjamin Franklin Long for 4.75 acres on Lovett Road for $5000.00 or $1050.00 per acre. This sale took place on February 28, 1964. Lovett Road is approximately two and a half or three miles from the subject property. He also studied a sale from Ella Graham in 1963 of 38.85 acres for $58,500.00 or $1500.00 per acre. This is on the Greenwell Springs Road approximately a mile and a half east of Frenchtown Road. He used also the sale of lots in Alford Acres which is adjacent to the subject property using seven sales. These comparable sales that he used came to an average of $2200.00 per lot.
Another appraiser for the defendant was Mr. Kermit Williams whose appraisal is the basis for the Trial Judge’s decision in this matter. Mr. Williams has been in the real estate and appraising business for many years and had testified on numerous occasions in the District Courts. He used as his method of making the appraisement the extraction of land value based on the development of the land as into a residential subdivision. Fie testified the highest and best use of the property was for residential development. He came up with the value of $2500.00 per lot for a total sales price for the 38 lots of $95,000.00. I-Ie figured his value per comparable at $1366.00 per acre, or $1400.00. He then deducted from the sales price a 10% selling cost of $9500.00 and the following development costs: utilities, water $3550.00, gas $3588.00 miscellaneous $3645.00, sewers and so forth $13,395.00, street developments ■ $25,000.00. This totals $49,088.00 as the cost of the development leaving a balance of $36,412.00. *668 Pie figured an estimated profit of $9103.00 which he deducted, leaving a net value of $27,309.00. To this he added previous expenditures of the defendant amounting to $3645.00 which gave him a net of $30,954.00 as the total value of the 22.15 acres, or a value per acre of $1400.00. He further testified that wooded lots are more valuable and there were four acres west of the line and fourteen acres east of the right of way-line. His analyzing of these figures would give the value of the land taken as $5320.-00. He testified that there was no use for the land under the high power lines and no residual value. There would be no residential use for the land and it would have to be added to the adjacent properties. Someone may make some little use of it but to a developer it would not mean any additional money to him in adding this to the adjacent lots.
Mr. Williams then estimated that there would be 25 lots remaining in the land of the defendant which of course would have to be replotted. He then estimated the remaining 25 lots at $2500.00 each, or a total of $62,500.00. He subtracted the selling costs at $6250.00 giving an adjusted gross income of $56,250.00. He then estimated the development costs on the remaining land at water $1870.00, gas $1950.00, street, sewerage and engineering costs at $30,146.-50, promotional costs $2641.00 which would make a total development cost of $36,578.00. He then subtracted the development costs from the adjusted gross income of $56,250.-00 which left an adjusted income of $19,-672.00. From this he took a developer’s profit of 25% or $4,918.00 leaving a net value of the land consisting of 18.35 acres of $14,754.00. This would give an indicated value of $800.00 per acre for the remaining land in the subdivision development. He further testified that he saw no reason why the subdivision could not be developed at the present time.
He then subtracted from the original value of the land the figure of $5320.00 which he estimated was the value of the land taken before the taking and arrived at a value of $25,634.00 being the value of the remainder as if it were part of the whole. However, the remainder being in two different pieces of land would be less amenable to good subdivision development. He then subtracted the value of the land after the taking which is $14,754.00 from the value of the remainder as a part of the whole which is $25,634.00 and gave an estimated severance damage of $10,780.00. Adding to the $10,780.00 the value of the part taken of $5320.00 making a total estimated loss of $16,100.00.
An engineer, Mr. Sam G. Dupree testified for plaintiff and he estimated a reasonable profit on a subdivision of 40%, but there would be a 10% variance in costs and' 5% to 10% contingency. He did his own engineering work. He further testified that the front 45 feet of lots 18 through 31 would be in the servitude. One-third of Lot 16 and one-half of Lot 17 would have an access only through the servitude.
On rebuttal plaintiffs witness J. B. Pugh estimated the value of each individual lot using the deduction of the typical lot of $150.00 to estimate the difference in the-drive and utilities and in doing so he arrived at a total value of $52,550.00. He-estimated the remaining value of Lot 17 as. $500.00, having deducted $1000.00 from it. He then deducted from $56,100.00 his estimated gross income figure from the sale of these lots the said sum of $52,550.00 and came up with a difference of $3550.00! which is the difference, in his opinion, that would be occasioned by the existence of the power line. From the $3550.00 he deducted $350.00 for a real estate commission! which would leave $3195.00 which he them estimated was the severance damages. He-testified that the land above and below the-servitude had a 10% loss, and this made-the acreage value at $540.00 an acre. He-further testified that the lots move quicker in sales without servitude.
Mr. Lejeune, plaintiff’s witness, on rebuttal testified that he valued the lots at $2000.00 each with water, and $1500.00 with *669 out water. He further estimated that Lots 17 through 31, or 17 lots facing the right of way would suffer a loss in value of approximately $500.00 each. This would make a total value of $7500.00 damage to these particular lots.
There is testimony in the record concerning the fact that there were other subdivisions in Baton Rouge that had power lines running through them. However, it was brought out that the lines were there before the subdivisions were plotted out, and the subdivisions were laid out around the right of ways.
There is also testimony that the lots under the high power lines are less valuable and people would not want to build under them or own them, or live in close proximity to them. In fact, the Trial Judge commented in one of his rulings concerning psychological fear and that severance damages may be based on the percentage of depreciation to the remaining property caused by the dangerous conditions presented by placing the utility on the property. This would have a psychological effect of fear affecting prospective purchasers, and reduce the market value.
In this connection he cited Central Louisiana Electric Company v. Harang, La.App., 131 So.2d 398, at page 402. The pertinent part of this decision is as follows:
“Severance damages may be based upon the percentage of depreciation to the remaining property caused by the dangerous condition presented by placing the utility on the property. Tennessee Gas Transmission Co. v. Primeaux, supra [La.App., 100 So.2d 917]. Even where no real danger exists, compensation may be made for the mere fear of danger to the extent that such psychological effect of deterring prospective purchasers reduce its market value. Texas Pipe Line Co. v. National Gasoline Co. of Louisiana, Inc., 203 La. 787, 14 So.2d 636; Texas Pipe Line Co. v. Barbe, supra [229 La. 191, 85 So.2d 260].”
 Plaintiff argues that Mrs. Wright took such a long time to start and proceed with the development of her proposed subdivision that she should have been held as having abandoned it. However, we find this contention disposed of in the case of State of Louisiana, Through Department of Highways v. Rapier, 152 So.2d 272, a decision of this Court, which holds as follows :
“ * * * Potential residential subdivision or industrial use, to serve as the basis of establishing market value in an expropriation proceeding must be shown to be reasonably prospective, as distinguished from remotely prospective to remove from such potential use or classification from the realm of guesswork, speculation and conjecture. If such potential future use is shown within the reasonably near future, the owner is entitled to compensation on the basis of such use notwithstanding the property is not being utilized for such use at the time of the taking. Central Louisiana Electric Co. v. Harang, La.App., 131 So.2d 398; Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6.”
Plaintiff in his brief submits that an award of $2201.79 for the value of the servitude taken, and an additional award of $3110.00 as severance damages to defendant’s remaining property or a total of $5311.00 would adequately compensate said land owner.
However, the Trial Judge, who knew the parties, heard and saw the witnesses testify, chose to base his award on the testimony of Mr. Kermit Williams as supported by Mr. W. D. McCants.
 The Trial Judge in his finding of fact and passing on the credibility of the witnesses will not be disturbed unless manifestly erroneous, or shown to be an abuse of his discretion. We do not feel that any abuse of discretion has been shown in this matter and we therefore affirm the judgment of the Lower Court.
Affirmed.